IN THE MATTER of the ESTATE of J. F. O. BANNING, Deceased.

IN PROBATE.    BEFORE COOPER, JUDGE.

DECISION ON EXCEPTIONS TO ADMINISTRATOR'S ACCOUNTS.

Mr. Banning died in San Francisco, California, August 6th, 1886, leaving surviving him Clara H. Banning, his widow, and Bernhardt Rudolph, his son. On the 30th day of August, 1886, John H. Paty, then a member of Bishop & Company, filed a petition in the Supreme Court for the probate of the will and codicils of deceased, and prayed that letters testamentary issue to the widow and Charles R. Bishop in accordance with the terms of the will; the Court fixed the 28th day of October, 1886, as the day for hearing the petition. On September 21st, 1886, William Maertens and P. Opfergelt, surviving members of the Honolulu firm of Ed. Hoffschlaeger

& Company, of which the deceased was the other member, filed a petition praying for the appointment of a temporary administrator, and nominated W. F. Allen to act as such. Temporary letters were issued to Mr. Allen the same day under a bond of $10,000. Mr. Allen filed an inventory of the estate on the 20th of October, 1886, by which it appeared that the assets of the estate were as follows:

### PERSONAL PROPERTY.

| | | |
|---|---:|---:|
| Credit on book of Ed. Hoffschlaeger & Co., Sept. 30th, 1886 | $139,742 | 35 |
| Collected on account of notes | 12,423 | 65 |
| Notes secured | 30,000 | 00 |
| Real estate | 250 | 00 |
| Total | $182,416 | 00 |

The hearing on the petition for the probate of the will was had on the 3rd of November, 1886, the matter having been continued from the 28th day of October, the day set in the order of publication, by order of Court.

Autograph letters from both Mrs. Banning and Rudolph directed to Henry Smith, Clerk of the Court, accepting service of notice of proceedings and appointing S. B. Dole, Esq., attorney to act in the matter, were read and filed. Mr. Dole then filed the renunciation of Mrs. Banning, wherein she renounced the "appointment and all right and claim to letters testamentary of the said will or to act as executrix thereof." Mr. Dole also stated that Mr. Bishop, the executor named in the will, had positively declined to act as such, and that the widow had nominated Mr. W. F. Allen to act. The will was admitted to probate and Mr. Allen appointed administrator with the will annexed under a bond of $100,000. The bond was filed and letters issued to Mr. Allen on November 9th, 1886. Neither Mrs. Banning or Rudolph appear to have been present at the hearing, and from the dates on the letters and documents it is apparent that they were not in the country at the time. Mrs. Banning filed her election to

take the benefit of the provisions in the will in lieu of dower, on the 7th of April, 1887.

Mr. Allen filed his first account November 11th, 1887. The principal items therein are as follows :

| | | |
|---|---|---|
| Receipts ......................... ...........$155,138 | | 03 |
| Expenditures— | | |
| Mrs. Banning...............$7,978 57 | | |
| Administrator's commissions... 7,886 90 | | |
| Costs and legal expenses ...... 281 80 | | |
| Sundry bills................... 134 39 | | |
| ————$ 16,281 | | 66 |
| | | |
| Leaving a balance of.......................$138,856 | | 37 |
| Investment account........................ 135.500 | | 00 |
| | | |
| $   3,356 | | 37 |

The administrator also reported losses of the firm to have been $33,103.95, which is cited to make up the difference between actual receipts and estimated amount of the estate according to the inventory filed by the temporary administrator.

Mr. Rudolph Banning was present in court at the time this account was presented, and manifested his satisfaction with it.

The administrator filed his second account November 9th, 1888, third account December 2nd, 1889, fourth account November 3rd, 1891; these accounts were examined and approved in due course.   There was no appearance on the part of the present contestants at any of these hearings.   At the time the administrator filed his third account he made the suggestion that it be considered his final account, but it appearing that there were outstanding debts that might be collected, the  Court declined to allow his discharge.   On January 10th, 1893, the administrator filed his fifth account and with it his petition for discharge.   The matter came on for hearing on February 15th, 1893, there being present the

administrator and Rudolph Banning. The accounts show the total amount of investments to be $144,999.04; but the administrator reported a loss of $2200 upon the bonds of the Union Iron Works Company of Honolulu, this sum being deducted left a balance of $142,799.04. The accounts were examined and Mr. Banning expressed his satisfaction with them, and that he was ready to receipt for his share of the estate assets; they were approved, and the assets of the estate ordered distributed equally between Mrs. Banning and Rudolph, and the administrator ordered discharged upon his filing the receipts. The receipts were filed forthwith, and were in the following form :

"Received, Honolulu, February 15th, 1893, from Wm. F. Allen, administrator of the estate of J. F. O. Banning, deceased, my one-half of the estate as follows : In bonds, $34,400; notes secured, $36,675; cash, $324.54; total, $71,399.54; amounting to seventy-one thousand three hundred and ninety-nine and 54-100 dollars. Signed, B. R. Banning."

The receipt of Mrs. Banning's share was in the same form and for the same amounts, but signed by W. F. Allen as her attorney in fact.

These receipts do not show the actual basis of settlement so far as the division of securities is concerned, but a manual separation of the securities took place immediately after the receipts were filed, in accordance with a previously arranged schedule, Mr. Banning making his own selection, he receiving $40,000 in bonds and $28,125 in notes, making a total of $68,125. The allotment to Mrs. Banning was $27,000 in bonds and $45,255 in notes; total, $72,225. The difference between these amounts was adjusted between the parties, but in what way is not quite clear.

Mr. Banning gave Mr. Allen a power of attorney to act for him in the care of his half of the estate, which was dated February 28th, 1893. Mr. Banning left for the Coast March 29th, 1893, intending to be gone until the fall of that year, but returned by the same steamer, because he found that his

mother was dissatisfied with the securities allotted to her, and after his arrival in Honolulu he took steps towards the institution of these proceedings.

The original petition to vacate the order discharging the administrator was filed May 28th, 1893, for which there was substituted an amended petition filed June 19th, 1893. The amended petition alleged that the order discharging the administrator was made under a mistake of fact as to the terms of the will of the deceased, shared alike by the judge and the administrator; and that the administrator had not filed proper accounts, and that the securities in which the funds of the estate were invested were speculative, uncertain, shifting and unsafe, and that the receipt which had been filed for the distributive shares were given "under a misapprehension of material facts and conditions, and in consequence of concealment of material facts and conditions, and undue influence exercised" by the administrator. After the hearing a decision was rendered revoking the order of discharge and requiring the administrator to file his accounts for approval as of the 15th day of February, 1893. Two accounts, the sixth and seventh, were filed on the 12th of August, 1893; the sixth account included the transaction of the administrator up to the 10th of January, 1893. This account was referred to F. Wundenberg as Master on the 4th of September, 1893. The seventh account contained a statement of the affairs of the estate up to the 31st day of July, 1893.

On the 17th of August, 1893, Mrs. Banning filed a petition for the removal of Mr. Allen as administrator, and for the appointment of J. A. Magoon in his place, setting forth as reasons the facts alleged in the amended petition for the revocation of the order discharging the administrator; and also that there was no bond on file conditioned for the execution and performance of said trust. The motion was heard on the 4th of September, 1893, and denied, on the ground that no cause had been shown for the removal of Mr. Allen.

A new bond was filed on the 6th day of September, 1893, with approved sureties.

The Master's report was filed on October 1st, 1893, and the beneficiaries filed a motion to confirm the Master's report so far as the items of commission were concerned; and also to have the Master report upon the propriety of the investments. A decision was rendered, by which the rule was laid down, governing the allowance of commissions, but the motion to re-refer to the Master was denied on the ground that the subject of the enquiry was more properly for the Court.

The matter is now before the Court on the motion of the beneficiaries to disallow the accounts of the administrator so far as certain investments are concerned; and also upon the motion of B. R. Banning to disallow the accounts and to charge the administrator with the whole estate, including the share accepted by him when the administrator was discharged by the previous order. In support of his motion, Mr. Banning alleges: "That the securities represented by his receipt were not of equivalent value to the sum of $71,399.54, nor anywhere near said sum as said Allen then well knew," and "that said receipt was signed by him under misapprehension and ignorance of material facts and conditions affecting said receipts and securities supposed to be represented thereby, induced and resulted from intentional repression and in consequence of the intention and culpable failure and neglect on the part of Mr. Allen to properly advise him before signing the receipt" of the true condition and character of the investments and many other allegations of like tenor and effect.

Much new evidence was introduced at the hearing and the testimony taken at the previous trial was also admitted by stipulation to form a part of evidence to be considered at this time. The case was ably and exhaustively argued on behalf of the beneficiaries by A. S. Hartwell, Esq., and W. A. Kinney, Esq., and responded to by F. M. Hatch, Esq., for the administrator. Elaborate briefs were filed by both parties.

So far as I am informed this is the first case of its kind that has arisen in this country, and for that reason no assistance is to be had from the decisions of our Court; nor is there any statute law to look to to establish the rule which is to govern in the decision of the issues presented. Owing to the magnitude of the interests involved and the possible bearing that the outcome of the case may have upon kindred matters in this country, I have devoted many hours of anxious and sincere study to the case before reaching my conclusion, and now propose to treat the subject in the manner in which it has evolved itself to me, irrespective of the order in which the points were made by counsel.

It was claimed by counsel for the beneficiaries that an unintentional wrong had been done Mrs. Banning by obtaining from her the renunciation of her right to act as executrix, and that Mr. Allen, having seen fit to assume the sole management of the estate, under the provisions of the will, he subjected himself to a larger responsibility than if he had seen to it that Mrs. Banning had continued to act in accordance with the will.

· It seems not to be allowable to appoint an administrator with the will annexed unless the persons named in the will as executors have either all renounced their rights or have failed to appear when cited; but upon such renunciation or failure to appear it becomes the duty of the Court to make such appointment if the will does not make provision for filling the vacancy.

Schouler on Ex. & Ad. Secs. 42 and 51.

The will before us nominated and appointed Mrs. Banning and Charles R. Bishop to act jointly and severally, the trust to devolve upon the survivor of them. Mrs. Banning renounced the right and Mr. Bishop declined to act. The will made no provisions for the further appointment of an executor. It became necessary then that an administrator with the will annexed should be appointed, and it was within the discretion of the Court to appoint one or more persons to act as such. Mrs. Banning having approved of Mr. Allen's

appointment as temporary administrator, and having voluntarily renounced her right to be appointed executrix and having nominated Mr. Allen to be the administrator, it does not appear that Mr. Allen has done Mrs. Banning any wrong, either intentionally or unintentionally, and I cannot see that Mr. Allen is chargeable with any larger responsibility nor bound to exercise any greater degree of caution or discretion in transacting the business of the estate, except so far as the provisions of the will control, than if he had been appointed an administrator of an intestate.   The assets of the estate at its inception consisted entirely of personal property, except a single lot of land valued at $250; and although in ordinary cases of administration it is not within the province of an administrator to make investments, yet I do not find that Mr. Allen has in this case exceeded his duty in settling up the estate.   Perhaps the administration may have been continued longer than was absolutely necessary, but after the request for discharge made by Mr. Allen when filing his third account, which was refused by the Court, administration seems to have been continued by consent, awaiting the distribution of the estate when Mr. Banning should arrive at the stipulated age of majority.

As to Mr. Allen's conduct as administrator.   The inventory of the estate as filed by Mr. Allen as temporary administrator placed its value at $182,416.   $139,742.35 of which consisted of a credit on the books of Ed. Hoffschlaeger & Co.; the balance was in the form of promissory notes amounting to $52,424.65.   According to the Master's report the estate realized $156,049.15.   I do not propose to trace this amount down to the present account, leaving that to such action upon the Master's report as may be found proper, considering the only questions presented for decision to be —first, the force and effect of the act of settlement between the administrator and Mr. Banning; secondly, the propriety of certain investments specifically objected to by the beneficiary; thirdly, the rule to be applied in fixing the commissions to be allowed the administrator.

First—I find no reason for changing my views upon this point from those manifested in my former decision. The evidence has failed to show that Mr. Allen either misrepresented the condition of the estate or intentionally withheld any information that he was bound to disclose. On the other hand, I find that Mr. Banning had every opportunity to examine the investments and to approve or disapprove of them prior to the settlement with the administrator, and the allegation that Mr. Allen used undue influence in obtaining the settlement is equally unfounded. It was a transaction between man and man, and over which the Court had no control; it was simply a matter of administration.

In *Cowdin vs. Perry*, 11 Pick., 511, the Court say : "But the question to whom and at what time a legacy or distributive portion under a will is to be paid by the executor is one of which the judge of probate has no jurisdiction. Any decree directing the executor to pay or not to pay a legacy to any particular person or at what time a legacy should be paid, whether made upon or without notice, would be extrajudicial and would afford the .executor no justification. It would in this respect be similar to a decree directing payment of a bill when the estate is solvent, and as such a mere nullity. As to a waiver of his claim on the part of the plaintiff, we think there are not facts enough to support it. The doctrine of waiver is a most reasonable one, and where a person especially in the discharge of some office or duty does an act which he supposes to be correct, and those interested knowing the facts assent to and affirm the act, the first principles of justice require that they should be bound by it."

If Mr. Banning had any claim upon Mr. Allen he has certainly waived it by his action; not merely in signing the receipt, but by all that he did prior to his leaving Honolulu on the 29th of March, 1893; all his acts tend to prove that he considered that Mr. Allen had done well.

A payment to Mr. Banning of his share of the estate in securities was justifiable.

In the case of *Perrie vs. Vreeland*, 33 N. J. Eq. Rep., 118 ;

where investments had been made in real estate, it was said: "He is bound to account for the fund, but is not bound to pay it over in cash. He may pay it over in the property itself." I am therefore of the opinion that the administrator is entitled to credit himself with the amount of the securities and money delivered to Mr. Banning in accordance with the settlement of February 15th, 1893.

Second—As to the propriety of the investments. In an examination of the numerous cases in the American and English reports bearing upon this subject, I find that although there is a wide difference of opinion as to what are proper securities for the investment of funds belonging to estates in the hands of executors and administrators, yet as to the general rule regulating the conduct of executors and administrators in the management of the estate, the courts are practically unanimous. In the absence of any statutory provisions limiting investments to certain specific securities, the courts have not been inclined to adopt any rule that would work a hardship on persons who have been intrusted with the care of the funds of others by requiring of them greater intelligence, judgment or discretion than that of the ordinary business man, but have required of them the strictest integrity, and that too to the minutest detail. The courts well say that to impose burdens upon them who are capable and willing to undertake such matters that are not put upon others in the transaction of their own business, would result in making it impossible to find men who would dare to accept such employment. Not now discussing as to what kind of investments courts have approved, I propose to cite a few cases touching upon the general rule.

In *Harvard College vs. Amory*, 9 Pick., 465, the Court say: "Trustees are justly and uniformly considered favorably, and it is of great importance to bereaved families and orphans that they should not be held to make good losses in the depreciation of stocks or the failure of the capital itself which they held in trust, provided they conduct themselves honestly and discreetly and carefully according to the existing

circumstances, in the discharge of their trusts.   If this were held otherwise, no prudent man would run the hazard of losses which might happen without any neglect or breach of good faith."   This case was cited and approved in *Brown vs. French*, 125 Mass., 415.

In *Whitney vs. Peddicord*, 63 Ill., 251, the Court say :   " As we have had occasion to remark in another case at the present term, a degree of strictness is not to be applied in the construction of their acts or those of guardians which would deter responsible men from the acceptance of such positions.   When they have acted with reasonable diligence and an honest desire to do their duty faithfully, a mere error of judgment in what was fairly matter of judgment or opinion should not make them liable merely because subsequent events have shown that they did not pursue the wisest course."

Again, in *Ormiston vs. Olcott*, 84 N. Y., 343 :   " The rule should not be made arbitrary and inflexible, and so rigid as to admit of no possible exception, for it is merely an out-growth or consequence of the broader and admitted proposi-tion that the duty of a trustee in making investments is to employ such diligence and such prudence as in general prudent men of discretion and intelligence in such matters employ in their own like affairs.   *   *   *   And while no rule of proper responsibility should be relaxed, yet where he acts honestly and in good faith and with reasonable prudence and discretion, he should not be held liable for unfortunate results which he could not be expected to foresee and was powerless to prevent.

In *King vs. Talbot*, 40 N. Y., 85, Woodruff, J., said :   " The real enquiry therefore is in my judgment in the case before us and in all like cases, has the administration of the trust created by the will of Charles King for the benefit of the plaintiff, been governed by fidelity, diligence and prudence. If it has the defendants are not liable for the losses which nevertheless have happened.   *   *   *   My own judgment, after an examination of the subject, and bearing in mind the nature of the office, its importance and the considerations

which alone induce men of suitable experience, capacity and responsibility to accept its usually thankless burden is that the just and true rule is that the trustee is bound to employ such diligence and such prudence in the care and management as in general prudent men of discretion and intelligence in such matters employ in their own like affairs."

As to the class of securities that have been held to be safe and proper investments for moneys held in trust. The English decisions are almost a unit in declaring that the public funds and loans upon real estate security are the only ones that will be sanctioned. In the New York cases above cited, although the courts have rather disclaimed the binding force of the English common law in that State yet they have almost without exception adopted the English rule ; while the Massachusetts courts have taken a decidedly broader view of the matter. The precedent established by the case of *Harvard College vs. Amory*, 9 Pick., 465, is somewhat weakened by the express provision in the will that the executor might invest the funds in safe and productive stocks, but this rule is cited, approved and followed in the case of *Lovell vs. Minot*, 20 Pick., 119. In that case (*College vs. Amory*), the Court approved of the following investments :

| | | |
|---|---:|---:|
| 78 shares in N. E. Bank stock.................$ | 8,333 | 33 |
| 247 shares Fire and Marine Insurance Company. | 16,466 | 67 |
| 9 shares in Boston Manufacturing Company, and 9 shares in Merrimack Manufacturing Company ; say 18 shares of $1,000 at 40 per cent. advance ......................... | 25,200 | 00 |
| Total .................................$ | 50,000 | 00 |

In *Lovell vs. Minot*, the guardian made a loan upon a promissory note secured by shares in a manufacturing corporation; the maker failed and also the endorsers and the stock became depreciated below the face of the note. Shaw, C. J., said referring to *College vs. Amory*: "Taking this to be the rule, the Court are of opinion that the guardian acted in

good faith and with sound discretion in making the investment which he did. He took the note of a person then in good credit, with a pledge of stock as collateral security at the rate of about three quarters of its par value and less than three quarters of its market value.  *   *   *   The subsequent transaction in the sale of these shares is open to the same considerations. It was conducted with good faith and sound discretion, and though as events turned out in consequence of the failure of the purchaser and of his two endorsers and of the debtor on the mortgage given for collateral security. It would have been better and for the interest of the ward if the shares had not been sold, yet this could not be foreseen, and is no proof of negligence or want of sound discretion." Both of the above cases are cited and approved by the court in *Brown vs. French*, 125 Mass., 415. In that case bonds of a railroad company in course of construction were held under the circumstances to be a proper investment.

Has Mr. Allen acted with a sound discretion in making the investments complained of. In determining this question I adopt the rule as laid down in the cases before cited, but decline to be bound by the specific preferences manifested in those decisions, except so far as by a parity of reasons and conditions I find them useful as a guide. We are an isolated community ; not only almost entirely dependent upon our internal resources, but subject to outside influences, largely if not quite beyond our control. A man's actions are necessarily governed by his opportunities, and a criterion that might be just in another country might not be a true standard to judge by in this.

It was urged as an indication of the unsoundness of the securities that they were unmarketable and that the permanency and eventual worth depended upon the prosperity of the sugar industry. These objections can be as well made to every form of security in this country, real estate and government bonds included, for it is beyond question that upon the prosperity or failure of the sugar industry depends

the value of every kind of property and the welfare of the large majority of the inhabitants.    Trustees cannot be called upon to foretell the outcome of the future, nor be considered or held to be guarantors for all time of the investments which they may make.    What was the nature of the security at the time it was taken; and did Mr. Allen act as a prudent man in doing as he did.

The first security objected to is the investment in the O. R. & L. Co.'s bonds.    These bonds are secured by a first mortgage upon the property and franchise of the O. R. & L. Co., and are commonly known as the Pearl River Division bonds.    A similar investment was approved by the Justices of the Supreme Court in the estate of Lunalilo, and I find no reason for not following that suggestion.    It was shown that the earnings of the company were derived largely from freight produced by the Ewa plantation, and it was contended that if that plantation should suspend there would be no further need for the railroad, but, as before stated, I decline to discuss the possibilities of the future to that extent.    It was further shown that the company might have been forced into bankruptcy if pressed by its creditors, but that was not its condition at the time the investments were made nor would it necessarily render the bonds worthless nor depreciate their value to any great extent.    The question is, is the property covered by the mortgage apparently good security for the bonds, and was it so considered by prudent men.    I think this question should be answered in the affirmative. The next on the list are the bonds of the Kahuku Plantation. We must admit that our actions are controlled and influenced by the acts of others in whom we put confidence.    This was not a venture solely of Mr. Allen's, but others were interested with him, among whom were Messrs. Allen & Robinson, Bishop & Co., Grinbaum & Co. and James Campbell.    The mortgage given for the security of these bonds covered the entire property of the plantation, representing an outlay of over $500,000 and the issue of bonds was limited to $135,000.    I see no reason to doubt this

security. The only loss that the estate has suffered is that of the Union Iron Works Company bonds, amounting to $2,200 and a prospective loss on the Seattle Building Company bonds which may in view of the evidence be considered a loss. Both of these investments were made by Mr. S. M. Damon, whom Mr. Allen had selected to act for him during his absence from the country. Certainly Mr. Allen exercised due care and sound discretion in selecting one who has for so long a time occupied such a prominent place in the financial circle of the country. The same rule applies to Mr. Damon's conduct as to Mr. Allen, and it would require the clearest proof of neglect to justify a finding that Mr. Damon had failed to exercise due care and prudence in making these investments. The will authorized investments in the United States as well as in this country, and Mr. Damon found it almost impossible, although holding a position that kept him in constant touch with the financial public, to place money that was accumulating in this country where it would earn interest. Mr. Damon followed the lead of the late H. A. P. Carter in the Seattle investment, who invested a large sum in that enterprise; and in the Union Iron Works bonds, investments were made by the treasurer of the Queen Emma legacy fund, Bishop & Co., and G. N. Wilcox; and although both of these investments have proved unfortunate and have resulted in a loss, yet I do not find such a state of facts as would justify me in placing the burden upon the administrator.

One word as to the general stewardship of Mr. Allen. It was suggested by counsel for the beneficiaries that ample securities could have been had at the time these investments were made at from four to five per cent., intimating that such investments would have been proper and satisfactory to the estate. If Mr. Allen had adopted that course it would have resulted in his having realized for the estate in the way of income a little more than $45,000, instead of the $60,000 which he has secured, the difference being much more than the losses complained of.

Thirdly—As to the rule to be applied in fixing the commission to be allowed the administrator. On filing his first account about a year after his appointment Mr. Allen credited himself with the sum of $7,886.90 as commissions, being at the rate of ten, seven and five per cent. on $155,138.03, the amount of capital received. Mr. Banning was present in court when the account was approved, and made no objection. Mr. Hatch claims that that account was finally settled and was practically the end of the administration of the estate, and that Mr. Allen was entitled to his commissions, and that he has since acted in the capacity of trustee, and that the finding of Judge Preston, approving the accounts is now *res judicata*. I think not. This was not a final account within the meaning of our practice, nor was any particular item in controversy so as to raise an issue to be tried and determined, nor was the point expressly waived, which I understand to be essential in order that a finding may become *res judicata*.

In *Field vs. Hitchcock*, 14 Pick., 406, Shaw, C. J., said : " On an appeal from the decree of the judge of probate the question is whether the settlement of a former account by an executor can be pleaded as a final account so as to secure him from rendering a further account when cited for that purpose, and not only preclude the probate court from any further adjudication, but from all further inquiry. The court are of opinion that it was not competent for the probate court to decide that any account of the executor was final, so as to bar all further inquiry in regard to matters not included in the accounts already settled and to oust the probate court of its jurisdiction."

In order that Mr. Allen could be entitled to compensation as administrator in full he must have closed his accounts as such and have qualified as trustee. He was refused his discharge when he applied for it on filing his third account because administration was not complete.

In *Prior vs. Talbot*, 10 Cush. p. 3, Shaw, C. J., said : " The appellant was appointed executor of his father's will and was

directed to set apart a certain part of the estate, it first being converted into money, to appropriate the income to the widow for life and then distribute the principal. This imposed a duty upon the executor to retain the principal and invest it, and he must stand responsible until he has discharged himself of this implied trust. His duty is to administer the estate according to the will and such is the condition of his bond. Here he was appointed executor and trustee. If for greater convenience he wishes to close his account as executor and open a new account as trustee, he must give bond in the capacity of trustee and charge himself in one capacity *co in stanti*, and by the same act by which he claims his discharge in the other.

" The appellant having received the property as executor and having never qualified as trustee, is bound to account in his character of executor."

I adopt the former decision filed in this matter on this point. Such an application of the law of 1892 is not retroactive. The commissions that were allowed Mr. Allen were not due and did not become due until the law of 1892 went into effect. The Court in the matter of the Long estate, 7 Haw., 372, commenting upon Sec. 1281 of the Civil Code, say: " These percentages are for money both received and disbursed; they cannot be considered as being apportionable, one-half to the receipts and one-half to the disbursements."

A motion will be entertained to approve the Master's report if found to conform to the foregoing decision.

Note :—The other securities objected to being included in the settlement between Mr. Banning and the administrator, are not passed upon.

*A. S. Hartwell* and *W. A. Kinney*, for the beneficiaries.

*F. M. Hatch*, for the administrator.